UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALLORY BEARD,

     Plaintiff,

v.

     Case No:  12-10726

THE AUTO CLUB INSURANCE
ASSOCIATION,

     Hon. Nancy G. Edmunds

     Defendant.

_____/

| | |
|---|---|
| BURGESS & SHARP, PLLC | KIENBAUM OPPERWALL HARDY |
| Rex A. Burgess (P42779) |   & PELTON, P.L.C. |
| Heidi T. Sharp (P69641) | Elizabeth Hardy (37426) |
| Heidi J. Junttila (P72610) | Jay C. Boger (P58805) |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 43260 Garfield, Suite 280 | 280 N. Old Woodward Ave., Suite 400 |
| Clinton Township, MI 48038 | Birmingham, MI  48009 |
| (586) 226-2627 | (248) 645-0000 |
| rex@burgess-sharp.com | ehardy@kohp.com |
| | jboger@kohp.com |

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant The Auto Club Insurance Association, by and through its counsel, Kienbaum Opperwall Hardy & Pelton, P.L.C., moves this Court pursuant to Fed.R.Civ.P. 56 for an Order granting summary judgment in its favor.  In support of its motion, Defendant relies on the factual and legal authorities detailed in the accompanying Brief in Support of Defendant's Motion for Summary Judgment.

Concurrence of Plaintiff's counsel in the relief sought herein was requested but was denied, necessitating the bringing of this motion.

WHEREFORE, Defendant requests that the Court enter an Order granting summary judgment and dismissing Plaintiff's claims against Defendant, in their entirety, with prejudice.

Respectfully submitted,

KIENBAUM OPPERWALL
HARDY & PELTON, P.L.C.

BY:  */s/Jay C. Boger*
       Elizabeth P. Hardy (P37426)
       Jay C. Boger (P58805)
Attorneys for Defendant
280 North Old Woodward Ave.
Suite 400
Birmingham, Michigan  48009
(248) 645-0000
ehardy@kohp.com
jboger@kohp.com

Dated:  November 5, 2012

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALLORY BEARD,

     Plaintiff,

v.                                                            Case No:  12-10726

THE AUTO CLUB INSURANCE                      Hon. Nancy G. Edmunds
ASSOCIATION,

     Defendant.

_____/

| BURGESS & SHARP, PLLC | KIENBAUM OPPERWALL HARDY |
|---|---|
| Rex A. Burgess (P42779) |   & PELTON, P.L.C. |
| Heidi T. Sharp (P69641) | Elizabeth Hardy (37426) |
| Heidi J. Junttila (P72610) | Jay C. Boger (P58805) |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 43260 Garfield, Suite 280 | 280 N. Old Woodward Ave., Suite 400 |
| Clinton Township, MI 48038 | Birmingham, MI  48009 |
| (586) 226-2627 | (248) 645-0000 |
| rex@burgess-sharp.com | ehardy@kohp.com |
| | jboger@kohp.com |

_____/

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES..................................................................................................iii

STATEMENT OF ISSUES PRESENTED.........................................................................v

CONTROLLING AUTHORITIES...................................................................................vi

I. INTRODUCTION .........................................................................................................1

II. BACKGROUND FACTS ..............................................................................................2

      A.     Plaintiff Formerly Served As A Life Sales Manager Overseeing A Team
            Of Life Insurance Sales Agents. ............................................................................2

      B.     Complaints About Plaintiff's Management Style And Coworker
            Interactions Begin Soon After His Promotion To Life Manager...........................3

            1.     Complaints during the time that Plaintiff reported to Mr.
                  Huffman. ...............................................................................................3

            2.     Complaints during the time that Plaintiff reported directly
                  to Mr. Welsh. .........................................................................................4

      C.     Plaintiff Raises Concerns About A Bonus And An Interaction With
            Another Manager, And Mr. Welsh Investigates. ...................................................6

      D.     Plaintiff's Interactions With Co-Workers Lead To More Complaints
            Through 2010 And Into Early 2011......................................................................7

      E.     ACIA Discharges Plaintiff Based On His Continued Improper
            Interactions With Coworkers. .............................................................................10

III. LEGAL ANALYSIS...................................................................................................11

      A.     Standard For Summary Judgment Under Fed.R.Civ.P. 56. ..................................11

      B.     Plaintiff's Race Played No Role In His Discharge. .............................................11

            1.     Plaintiff cannot show that ACIA treated him any differently
                  than comparable employees....................................................................12

            2.     ACIA was entitled to use its business judgment in assessing
                  the complaints against Plaintiff and deciding to terminate
                  his employment......................................................................................12

      C.     Plaintiff's Race Discrimination Claim Concerning His 2009 Bonus Fails
            As A Matter Of Law. ..........................................................................................17

D.    Plaintiff's Litany Of Other Complaints Do Not Constitute Adverse Employment Actions. ...........................................................................................19

IV. CONCLUSION.............................................................................................................. 19

# INDEX OF AUTHORITIES

## Cases

*Alexander v. Caresource*, 576 F.3d 551 (6th Cir. 2009)..............................................................11

*Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008)........................................................16

*Blizzard v. Marion Technical* College, __ F.3d __, 2012 U.S. App. LEXIS 21846, *18-19 (6th Cir. 10/19/12) .......................................................................................................12

*Braithwaite v. The Timken Co.*, 258 F.3d 488 (6th Cir. 2001) .....................................................15

*Brooks v. Ameren UE*, 345 F.3d 986 (8th Cir. 2003)...................................................................16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................11

*Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009)....................................................11, 15

*Clayton v. Meijer, Inc.*, 281 F3d 605 (6th Cir. 2002) ..................................................................12

*Gecewicz v. Henry Ford Macomb Hospital Corp.*, 683 F.3d 316 (6th Cir. 2012) .......................18

*Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379 (8th Cir. 1994)...........................................19

*Hazle v. Ford Motor Company*, 464 Mich. 456 (2001) ................................................................11

*Hendricks v. Western Reserve Care System and Forum Health*, 355 F.3d 444 (6th Cir. 2004) .....................................................................................................................................17

*Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996). ........................................19

*Lattimore v. Wild Flavors, Inc.*, 2012 U.S. Dist. LEXIS 7826 (E.D. Ky. 2012).........................16

*Martin v. Ohio Tpk. Comm'n*, 968 F.2d 606 (6th Cir. 1992)........................................................11

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992).........................................................12, 19

*Noble v. Brinker Int'l Inc.*, 391 F.3d 715 (6th Cir. 2004)...........................................................18

*Reynolds v. Humko Products*, 756 F.2d 469 (6th Cir. 1985) .......................................................16

*Rutherford v. Britthaven Inc.*, 452 Fed. Appx. 667 (6th Cir. 2011) ............................................17

*Sanford v. AXA Equitable Life Ins. Co.*, 2010 U.S. Dist. LEXIS 129464 (E.D. Mich. 2010)...................................................................................................................................14

*Scott v. FirstMerit Corp.*, 167 Fed. Appx. 480 (6th Cir. 2006) ...................................................15

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) ........................................................... 15, 17

**Statutes**

42 U.S.C. § 2000e, *et seq.*.................................................................................................... v

M.C.L. 37.2101, *et seq.*......................................................................................................... v

**Court Rules**

Fed.R.Civ.P. 56......................................................................................................... 1, 10

## STATEMENT OF ISSUES PRESENTED

Mallory Beard is a former manager in The Auto Club Insurance Association's ("ACIA") life insurance sales organization.  During his roughly three-year tenure in that position, his managers received numerous complaints about his mistreatment of, and negative interactions with, his subordinates and coworkers.  ACIA investigated the complaints, and counseled Plaintiff on the need to act more professionally and improve his management style.  Despite their efforts over a prolonged period, Plaintiff's behaviors did not change.  A variety of employees continued to report incidents of belittling and dictatorial conduct.  By early 2011, ACIA had concluded that its coaching and counseling efforts had failed and discharged Plaintiff because his management style did not comport with ACIA standards of conduct.

Despite Plaintiff's lengthy record of problem interactions, he filed this lawsuit alleging race discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. 37.2101, *et seq.*  Plaintiff claims that he was discharged and denied a bonus based on his race.  He also complains about alleged mistreatment during his employment (including claiming that one manager refused to shake his hand during a meeting).  To prove race discrimination, a plaintiff must demonstrate that he suffered an adverse action, was qualified for his position, was treated differently than similarly situated non-African-American employees, and that the employer's non-discriminatory reason for discharge was a pretext for actual race discrimination.

Where the record demonstrates that Plaintiff lacks any evidence that race was a factor in his discharge, that Plaintiff was not wrongly denied a bonus, and the other alleged instances of mistreatment are not actionable adverse actions, should Plaintiff's race discrimination claims be dismissed as a matter of law?

Defendant ACIA answers, "yes."

Plaintiff would answer, "no."

## CONTROLLING AUTHORITIES

**Cases:**

*Blizzard v. Marion Technical College*, __ F.3d __; 2012 U.S. App. LEXIS
    21846 (6th Cir. 10/19/12)

*Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009)

*Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996)

*Noble v. Brinker Int'l Inc.*, 391 F.3d 715 (6th Cir. 2004)

*Sanford v. AXA Equitable Life Ins. Co.*, 2010 U.S. Dist. LEXIS 129464 (E.D. Mich. 2010)

*Smith v. Leggett Wire*, 220 F.3d 752, 763 (6th Cir. 2000)

**Court Rules:**

Federal Rule of Civil Procedure 56

# I. INTRODUCTION

Plaintiff Mallory Beard was formerly a life sales manager for The Auto Club Insurance Association ("ACIA"). In that role, he oversaw approximately twenty life sales specialists who sold life insurance products on behalf of ACIA. During Plaintiff's roughly three-year tenure as a life manager (2008 to 2011), his managers received numerous complaints from coworkers about Plaintiff's dictatorial attitude and belittling treatment. For example, sales agents complained that Plaintiff singled them out and demeaned them in group meetings and communications; he prohibited bathroom breaks during meetings; and he treated his management-level peers rudely and in a condescending fashion in front of their staffs. This was not a case of one or two subordinates disliking their boss. A variety of ACIA employees reported similarly themed incidents over a three-year period. Plaintiff's managers investigated the complaints, including asking Plaintiff and other witnesses for their versions of events. In several instances, Plaintiff did not dispute the facts reported by the complainants. Plaintiff's managers coached him numerous times, both verbally and in writing, to improve his interactions and management style.

Unfortunately, Plaintiff continued to display the same behavior. By early 2011, management had reached its limit. After receiving additional reports that Plaintiff again engaged in inappropriate interactions with sales agents and managers, ACIA discharged Plaintiff based on his continued unacceptable behavior. While Plaintiff alleges that his race motivated his discharge, he has no evidence to support his claim. He explained at deposition that he merely suspects his colleagues embellished incidents to make him look bad and assumes that managers who investigated his claims had a lurking discriminatory motive – even though he admits he has no evidence to support such accusations. Plaintiff further testified that as an African-American, he intuitively knows when discrimination is occurring even though others might not recognize

1

the subtle indicators of animus that he perceives.

The company gave Plaintiff numerous opportunities to improve and meet its reasonable expectation that managers should treat their subordinates and coworkers professionally and with respect.  Regrettably, Plaintiff demonstrated an unwillingness or inability to change his attitude and to appropriately interact with his colleagues.  ACIA had every right – and in fact a duty – to investigate the numerous complaints it received about Plaintiff and make judgments about what had occurred.  Those judgments were based on the facts gathered in connection with a specific complaint, the fact that there was a repeat pattern of similar conduct over a many-year period, as well as management's own observations of Plaintiff acquired from one-on-one contact with him.  After assessing all of these factors, a decision was made to terminate Plaintiff's employment.  Plaintiff's discrimination claims fail as a matter of law.

## II. BACKGROUND FACTS

### A.    Plaintiff Formerly Served As A Life Sales Manager Overseeing A Team Of Life Insurance Sales Agents.

ACIA hired Plaintiff in July 2006 as a life specialist, i.e., a life insurance sales agent.  He performed satisfactorily in that role, which did not involve managing other employees.  (Huffman dep at 8-10, Exh A.)

In April 2008, ACIA promoted Plaintiff to life manager.  Then-Vice President of Michigan Field Operations Craig Huffman made the final decision on that promotion.  (Pl dep at 101-102, Exh B; Huffman dep at 10, Exh A.)  As a life manager, Plaintiff oversaw roughly twenty life specialists (or "life agents"), whose duties focused on selling ACIA life insurance products.  Plaintiff was responsible for a territory mainly comprised of Southeast Michigan.  His duties included some interviewing, hiring, and training of life agents, "installing" agents at branch offices or private insurance agencies (i.e., getting them physically set up in the location

2

and introduced and working in partnership with other agents), following up with agents to assist them in their selling efforts, and motivating agents to sell.  (John dep at 23-26, Exh C; See Dick dep at 23-24, 28, Exh D.)

Life managers have annual sales goals based on their life agents' yearly sales.  (Dick dep at 34, Exh D.)  A life manager receives a bonus if his sales team meets the production threshold. Plaintiff was eligible for annual bonuses if his sales team produced sufficient sales to meet his territory's sales requirement.  (Huffman dep at 28-29, Exh A; John dep at 114-117, Exh C.)

From April 2008 to August 2009, Plaintiff reported to Mr. Huffman.  From September 2009 through May 2010, Plaintiff reported to Vice President of Field Operations Tony Welsh. During these timeframes, Plaintiff was one of two life managers with territory responsibilities in Michigan.  The life sales operation underwent restructuring in 2010, resulting in Plaintiff reporting to Assistant Vice President Life Insurance Michael John and the addition of a third life manager to assist with Michigan territories.  (Welsh Decl at ¶ 4, Exh E; Welsh dep at 21-22, Exh F.)

**B.**    **Complaints About Plaintiff's Management Style And Coworker Interactions Begin Soon After His Promotion To Life Manager.**

Plaintiff's effectiveness as a sales agent did not translate to his manager role.  As a life manager, Plaintiff was responsible for effectively leading his team of life agents.  Unfortunately, soon after becoming a manager, Plaintiff exhibited problems interacting with his subordinates and coworkers.

**1.**    **Complaints during the time that Plaintiff reported to Mr. Huffman.**

Mr. Huffman counseled Plaintiff regarding several inappropriate interactions with his sales team.  He prepared an April 29, 2009 "Memorandum for Record" documenting problem

3

incidents, including Plaintiff acting in a belittling and condescending manner toward sales agents, making inappropriate comments during staff meetings (e.g., "If I dated your daughter and beat the hell out of her, would you want to be my partner?"), and taking a dictatorial approach to managing his sales agents. (Tab 1 to Exh E.) The employee complaints that led to the April 2009 coaching memo were lodged by several different subordinates of Mr. Beard, as opposed to originating with managers. (Records of employee complaints, Exh G; Dick dep at 62-74, Exh D) Several involved Plaintiff speaking so harshly with subordinates that they were brought to tears. (Dick dep at 62, 72-73, Exh D.) Mr. Huffman's memo documented a pattern of leadership issues that began at the outset of Plaintiff's tenure as a manager. The memo also advised Plaintiff that he needed to change his management style and improve the manner in which he interacted with his subordinates and coworkers. Mr. Huffman set forth guidelines for Plaintiff to follow in order to improve. (Tab 1 to Exh E, p 2.) Mr. Huffman reviewed the memo with Plaintiff and Plaintiff signed it. (Pl dep at 302, 380-381, Exh B.)

### 2. Complaints during the time that Plaintiff reported directly to Mr. Welsh.

Despite prior coaching, Plaintiff continued to have problems interacting with his subordinates and coworkers during the time that he reported directly to Mr. Welsh (September 2009 through May 2010). Many of these issues were documented in Plaintiff's 2010 Mid-Year Partners In Performance ("PIP") review. (Tab 2 to Exh E.)

Mr. Welsh investigated each of the documented issues, including asking Plaintiff for his version of the events. (Welsh Decl at ¶¶ 6-10, Exh E.) One of the issues involved Plaintiff's then-administrative assistant, Lisa Earhart, who went to Mr. Welsh in tears complaining that Plaintiff unfairly scored her performance rating. (*Id.* at ¶ 7.) Life Sales Director Gary Dick testified that Ms. Earhart had also come to him crying on multiple occasions, reporting that

Plaintiff had screamed at her.  (Dick dep at 73-74, Exh D.)  Ms. Earhart complained to Mr. Welsh that Plaintiff made her feel threatened and intimidated – telling her she would be sorry that she challenged the review.  She was also upset because Plaintiff did not provide clear direction on performance expectations, and she felt her rating had been downgraded based on unreasonable requirements.  (Welsh Decl at ¶ 7, Exh E.)  Mr. Welsh spoke with Plaintiff and concluded that because the review contained sparse detail supporting the performance scores and no input from other managers, Plaintiff had not followed established company procedures for completing the review and had not clearly communicated expectations to her.  (*Id.*; see also Welsh email, Exh H.)  The review was revised, but Ms. Earhart nevertheless quit her employment soon after this incident.  (Welsh Decl at ¶ 7, Exh E.)

Mr. Welsh also documented Bay City Branch Manager Karen Foco's complaint that Plaintiff acted rudely and unprofessionally during a meeting.  (Tab 2 to Exh E, p 4, 7.)  Ms. Foco complained that Plaintiff questioned how her staff was performing in front of her subordinates and dictated to her how life sales should be made.  Ms. Foco indicated that she felt disrespected, and she walked out of the meeting.  (Welsh Decl at ¶ 10, Exh E; John dep at 17-23, Exh C.)  Plaintiff acknowledged the basic facts of the incident, including that he met with Ms. Foco and sales agents and explained how a certain sales system works and how managers were to use it.  But he denied intending to be rude.  (Pl dep at 257-258, Exh B.)  Mr. Welsh found Ms. Foco's version of the events to be more credible than Plaintiff's and concluded she had no motivation to fabricate the incident.  (Welsh Decl at ¶ 10, Exh E.)

After receiving complaints that Plaintiff was interfering with the management training program for new agents by talking to trainees about early release into the field, Mr. Welsh and other managers reiterated to Plaintiff that trainees needed to meet their sales threshold before

being released and counseled him not to promise agents earlier placement without discussion and agreement of all relevant managers. (Welsh Decl at ¶ 8, Exh E.)[1] Communications made without the involvement of the training managers were confusing to agents and undermined the managers in the ADC training center. Plaintiff told Mr. Welsh that he did not prematurely contact agents, but Mr. Welsh's discussions with the training managers and agents themselves indicated otherwise. (*Id.*)

The 2010 PIP also documented Plaintiff's inability to provide paperwork that was important to the defense of a lawsuit filed by a prior employee and Plaintiff's violation of Mr. Welsh's directive not to announce a new realignment of territories that management was planning to roll out. (Tab 2 to Exh E, p 3, 5-6.) Mr. Welsh explained his expectation that Plaintiff needed to improve his interactions with coworkers and correct the areas noted. (*Id.* p 4-7.)

### C.   Plaintiff Raises Concerns About A Bonus And An Interaction With Another Manager, And Mr. Welsh Investigates.

During Plaintiff and Mr. Welsh's 2010 PIP discussions, Plaintiff raised issues concerning his eligibility for a bonus and reported that Director Gary Dick had refused to shake his hand. (See Tab 2 to Exh E, p 7-8.) Plaintiff claimed that the preliminary production numbers he was given at year-end 2009 showed his agents meeting their production goal, meaning he would have met his sales goal and become eligible for a bonus. The final sales numbers, however, indicated

---

[1] All new sales agent trainees must spend time in the company's Agent Development Center ("ADC") to ensure that they have the proper training and experience to be successful in the field. All trainees residing within fifty miles of the company's Dearborn, Michigan headquarters are required to remain in the ADC until they issue or are near issuing $18,000 worth of net life insurance premiums. Until the agent trainee is released to the field, their production credits are not counted toward their life manager's sales goals. (*Id.* at ¶ 8.)

that Plaintiff fell short of the goal.[2]  Plaintiff first raised this issue in early 2010, but revisited it during the PIP discussion.  (Welsh dep at 25-26, Exh F.)  Both times, Mr. Welsh investigated, including directing company sales analysts to perform close and careful reviews of Plaintiff's territory's production to determine whether Plaintiff met the established goal.  (*Id.* at 25-27; Welsh emails, Exhs K and L.)  Sales analysts confirmed that Plaintiff's team missed the sales goal, albeit by a small margin, and Plaintiff did not receive a 2009 year-end bonus.  (Welsh email, Exh L.)

As to the handshake, Plaintiff claimed that Mr. Dick refused to shake his hand during an interaction in Mr. Dick's office.  Mr. Welsh questioned Mr. Dick about the incident, who adamantly denied that such an event had occurred or that he had ever been disrespectful of Plaintiff.  (Dick dep at 81-82, Exh D; Welsh memo, Exh M.)  Mr. Welsh was unable to determine any wrongdoing on Mr. Dick's part and closed the matter with a memo to file provided to both Plaintiff and Mr. Dick.  (Exh M.)

### D.   Plaintiff's Interactions With Co-Workers Lead To More Complaints Through 2010 And Into Early 2011.

Upon assuming the Assistant Vice President Life Insurance role in mid-2010, Mike John experienced his own frustrations with Plaintiff and received several additional complaints about Plaintiff from others.  Despite clear direction and reminders, Plaintiff failed to provide Mr. John production numbers necessary for a meeting between Mr. John and his superiors.  Mr. John was frustrated by the antipathy and lack of urgency that Plaintiff displayed in connection with this incident.  (See Pl dep at 246-252, Exh B.)

---

[2] While Plaintiff claims that he would have been entitled to a bonus in the neighborhood of $50,000, the actual amount – had he met 100% production goal – would have been between $10,000 and $15,000 (12.5% of his $90,000 salary).  (See Management Incentive emails, Exh J.)

Around the same time, Sales Agent Mitch Katz complained to Mr. John that Plaintiff had not provided him necessary guidance.   Mr. Katz, who was assigned to Plaintiff's team and worked in Utica, was frustrated by the lack of assistance, noting that Plaintiff appeared to not even know his name (often referring to him as "Mike").   Mr. Katz' version of the events was corroborated by the Utica branch manager, who stated that he had not seen Plaintiff come to the branch to assist Mr. Katz.  (Welsh Decl at ¶ 13, Exh E; John dep at 31-34, Exh C.)   Two of Plaintiff's other sales agents, John Pagoto and Stan Khanna, complained to Mr. John that Plaintiff applied undue pressure on both to agree to be placed in certain branch offices.  (Welsh Decl at ¶ 14, Exh E; John dep at 84-85, 87-90, Exh C.)   Another manager, Bill Czepcinski, complained to Mr. John that Plaintiff was unwilling to assist him in a promotional effort by simply giving him a thermos bearing the company's logo.  Mr. Czepcinski reported that he asked Plaintiff for a thermos, but Plaintiff told him to buy his own.  (Welsh Decl at ¶ 15, Exh E; John dep at 52-55, Exh C.)  Plaintiff acknowledged denying Mr. Czepcinski's request, but claimed he did so in a respectful way.  (Pl dep at 281-282, Exh B.)  Mr. Czepcinski, however, felt Plaintiff had been rude and unhelpful, and his complaint mirrored the reports about Plaintiff that management had heard from so many others.

Mr. John spoke with Plaintiff about these issues and provided coaching assistance.  (John dep at 94, Exh C.)   Plaintiff contends that Mr. John was being overbearing, and – after an argument over Mr. John's request that Plaintiff help train a new agent – Plaintiff contacted employee relations.  (Pl dep at 419-421, Exh B.)  Plaintiff and Mr. John met with Employee Relations and Diversity Manager Pamela Porter.  Ms. Porter knew Plaintiff prior to this because sales agents had previously complained to her about his treatment of them.  (Porter Decl at ¶¶ 4-5, Exh N)  Plaintiff told Ms. Porter that Mr. John was too demanding and treated him unfairly by

documenting additional issues that arose between him and his colleagues. (Pl dep at 421-424, Exh B.)  Ms. Porter, who is African-American, listened to Plaintiff and reviewed a series of emails between Plaintiff and Mr. John.  She concluded that while Plaintiff disagreed with the perceptions of others about his conduct, nothing indicated that Plaintiff was being treated unfairly. (Porter Decl at ¶ 5, Exh N.)

Despite the numerous coachings and opportunities to improve, managers continued to receive complaints about Plaintiff's interactions.  In January 2011, Sales Agent Floyd Wells complained that Plaintiff treated him in an aggressive and threatening manner.  He stated that Plaintiff accused him of being disrespectful, lectured him at length, and pressured him to commit to working for him. (Welsh Decl at ¶ 16, Exh E; John dep at 68-71, Exh C; Interview transcript at 1-2, 6-7, Exh O; Dick dep at 45, 53, Exh D.)  Mr. Wells also reported that during this interaction Plaintiff bad-mouthed other sales managers and talked about his expectation that a coworker should be fired for incompetence. (*Id.*)  Mr. Welsh met with Plaintiff to understand his version of these events.  Plaintiff did not dispute that there was a confrontation, but he claimed Mr. Wells started it.  Plaintiff also acknowledged mentioning during his interaction with Mr. Wells the sales managers that Mr. Wells reported were slandered. (Welsh Decl at ¶ 16, Exh E.)

Washtenaw Branch Manager Micki Maniachi also complained to Mr. John in January 2011 about an interaction she had with Plaintiff in her branch office.  Ms. Maniachi reported that Plaintiff came to the branch with a new sales agent and announced that they were "interviewing" Ms. Maniachi.  She considered this condescending and disrespectful because she was a peer of Plaintiff, and this was her office.  Ms. Maniachi reported that during their meeting with two sales agents, Plaintiff also asked whether the branch would be closing and stated that another agent would soon be discharged, both inappropriate subjects to discuss in the presence of other agents.

Ms. Maniachi also reported that Plaintiff made statements that gave her the impression he was criticizing another life manager's performance.  (Welsh Decl at ¶ 17, Exh E; John dep at 55-58, Exh C.)  Messrs. Welsh and John met with Plaintiff to understand his version of the events.  Plaintiff admitted that he and a new sales agent went to the branch and that the sales agent began "interviewing" Ms. Maniachi.  He also admitted mentioning during this meeting that another agent was on probation.  One of the agents in attendance recounted that Plaintiff stated that he expected a sales agent would be separating from the company (i.e., was being discharged) and discussed the issue of office closings during the meeting.  (*Id.*)

### E.    ACIA Discharges Plaintiff Based On His Continued Improper Interactions With Coworkers.

After investigating these latest two incidents, Mr. Welsh decided to recommend that Plaintiff be terminated.  He had fielded many complaints lodged by subordinates and coworkers and personally coached Plaintiff to improve his management style and interactions.  Mr. Welsh was also aware of prior complaints that had been reported to other managers and other managers' efforts to coach and counsel Plaintiff.  It was evident to Mr. Welsh that Plaintiff was failing to understand that – as a manager and leader – he was obligated to exercise discipline, self-control, and professionalism and to treat subordinates and other managers with respect.  Mr. Welsh concluded that Plaintiff was either unwilling or unable to make the improvements necessary to continue his employment with the company, and he lost confidence that Plaintiff would ever be an effective leader.  (Welsh Decl at ¶ 18, Exh E.)  Mr. Welsh reviewed his decision with human resources/employee relations personnel (including Ms. Porter) and legal counsel, who supported the decision.  (*Id.* at ¶ 21; Porter Decl at ¶ 6, Exh N.)  Mr. Welsh attests that Plaintiff's race played no role in his decision.  (Welsh Decl at ¶ 19, Exh E.)

### III. LEGAL ANALYSIS

**A.  Standard For Summary Judgment Under Fed.R.Civ.P. 56.**

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Tpk. Comm'n*, 968 F.2d 606, 608 (6th Cir. 1992).

**B.  Plaintiff's Race Played No Role In His Discharge.**

This case does not involve any evidence – let alone direct evidence – of discrimination. To prove his claim, Plaintiff must therefore demonstrate a *prima facie* case by showing that: (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) others, similarly situated and outside the protected class, would have been or were treated differently. *Alexander v. Caresource*, 576 F.3d 551, 559 (6th Cir. 2009); *Hazle v. Ford Motor Company*, 464 Mich. 456, 463 (2001).  In the event that Plaintiff establishes a *prima facie* case, ACIA can rebut it by articulating a legitimate non-discriminatory reason for its action.  Thereafter, Plaintiff would have the burden of showing that ACIA's asserted reason was not the actual reason for its actions, but in fact was pretext for discrimination based on race. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009); *Hazle*, 464 Mich. at 464-466.

11

### 1. Plaintiff cannot show that ACIA treated him any differently than comparable employees.

Plaintiff cannot demonstrate a *prima facie* case because he cannot point to another manager with a similarly poor record of interactions with subordinates and coworkers, but who was not then discharged. See, *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-612 (6th Cir. 2002), and *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583-584 (6th Cir. 1992) (requiring a plaintiff to show that alleged comparable employees are similarly situated in all material respects; there can be no qualitative difference in the circumstances that would distinguish their conduct or the employer's treatment of them).  Plaintiff has no evidence that ACIA held non-African-American managers to different standards.  In fact, the undisputed evidence establishes just the opposite. Ms. Porter attests that all managers are required to conduct themselves in professional and productive manner, and Mr. Welsh attests that ACIA has discharged non-African-American managers based on poor managerial skills.  (Porter Decl at ¶ 6, Exh N; Welsh Decl at ¶ 22, Exh E.)  As a consequence, Plaintiff cannot establish a *prima facie* case because he cannot satisfy prongs three and four – that he continued to be qualified for the position, and that a comparable employee was or would have been treated more leniently. *Blizzard v. Marion Technical* College, __ F.3d __, 2012 U.S. App. LEXIS 21846, *18-19 (6th Cir. 10/19/12) (Slip Opinion, Exh P). *Clayton*, 281 F.3d at 612.

### 2. ACIA was entitled to use its business judgment in assessing the complaints against Plaintiff and deciding to terminate his employment

Even if Plaintiff could establish a *prima facie* case, ACIA had a legitimate non-discriminatory reason for his discharge, which Plaintiff cannot demonstrate is a pretext for actual race discrimination.  ACIA discharged Plaintiff based on its good-faith belief that Plaintiff continued over a several-year period – despite written and verbal warnings and coaching and

counseling – to have troubling interactions with coworkers. (Welsh Decl at ¶¶ 18-19, 21, Exh E.) Although some of the underlying facts related to these incidents were disputed by Plaintiff or, more commonly, he claimed his actions had been misinterpreted by others,[3] ACIA management had to make judgments after assessing all of the facts and considering the volume and consistency of complaints that had been reported by a wide array of individuals and which described a troubling pattern of misconduct on Plaintiff's part. The aggregation of these incidents over the course of time led ACIA management to conclude that Plaintiff was unable or unwilling to abide by its standards for managerial conduct.

Plaintiff has no evidence to challenge ACIA's assertions that its business judgments were made in good faith and were not motivated by a discriminatory animus. At deposition, he could not point to any evidence of race discrimination. The most he could do was state his belief that some of the complainants fabricated or embellished incidents and that he intuitively knew that certain members of management (namely Messrs. Welsh and Dick) were biased individuals despite the lack of any objective evidence of discriminatory motive. (Pl dep at 111-112, 172-173, Exh B.) Plaintiff admitted that his managers never made any statement about his race in writing or verbally. (*Id.* at 181-184.) Plaintiff also could not explain why a wide array of employees would fabricate stories about him (*id.* at 107-108, 261, 271, 302-304, 313, 317, 397), and he acknowledged that their reasons for reporting incidents could very well have had nothing

---

[3] It is apparently Plaintiff's counsel's theory that employees misperceived Plaintiff's conduct as rude due to a lack of understanding of cultural differences. Mr. Huffman's testimony demonstrates the unfounded nature of such a theory:

> Q [Plaintiff's counsel]: Obviously there is some difference in black culture and white culture. Did you find that some of these remarks, Mallory's remarks, even the ones being reported to you, may have had some cultural aspect to them, like referring to the secretary as girlfriend?
> A [Mr. Huffman]: I never consider black and white culture. The only thing I ever consider is corporate culture and what is appropriate. [Huffman dep at 38, see also 40-41, 44-45, 49-50, Exh A.]

to do with his race (*id.* at 429).  Further, Plaintiff cannot establish that management knowingly relied on false information.  He simply contends that because Messrs. Welsh and John did not give him the benefit of the doubt when considering various complaints, that is evidence of unfair treatment.  (*Id.* at 200, 208-209, 212-217.)  Plaintiff's speculative theories fall far short of demonstrating pretext.

The record establishes that managers received similarly themed complaints over an extended period of time from an array of Plaintiff's subordinates and coworkers.  (See, Welsh Decl at ¶¶ 5-17, Exh E; John dep at 15-33, 45-46, 52-58, 68-71, 84-85, Exh C.)  In many cases, the complainants had no connection with one another and there was no reason for management to conclude that they had a motivation to fabricate stories about Plaintiff.  ACIA investigated the complaints, including asking Plaintiff to explain his version of the events.  At times, Plaintiff acknowledged the basic facts of the complained-of interactions, which established improper conduct.  Other times, he asserted that the complainants misinterpreted his intent or misconstrued what he meant by his words.  (Pl dep at 258, 266, 281, 304-309, 323, 401-402, Exh B; Welsh Decl at ¶¶ 18-19, Exh E.)  While Plaintiff may quarrel with ACIA's business judgments, he cannot establish that ACIA acted unreasonably in concluding that, despite repeated coaching and counseling sessions, Plaintiff's behavior as a manager did not comport with ACIA's standards.

These circumstances are similar to those considered by this Court in *Sanford v. AXA Equitable Life Ins. Co.*, 2010 U.S. Dist. LEXIS 129464, *57 (E.D. Mich. 2010).[4]  There, the defendant employer investigated complaints by coworkers that the plaintiff conducted himself inappropriately during a business trip.  Investigators concluded that the evidence suggested the plaintiff engaged in unprofessional and inappropriate interactions with coworkers, warranting

---

[4] Unpublished cases referenced herein are included, in alphabetical order, as Exhibit Q.

14

discharge.  Following his termination, the plaintiff sued, alleging reverse-race discrimination and

arguing that the main reported incident did not occur.  This Court rejected the plaintiff's pretext

arguments giving deference to the employer's business judgments drawn from its investigation:

> Plaintiff fails to support his pretext allegations.  He fails to do so, in part, because the Court must view the pretext allegation in the context of the "honest belief" or "business judgment" rule.  If an employer has an "honest belief in a proffered reason for a [termination] [a court will uphold it] against a charge of pretext as long as the employer can identify particularized facts for its honest belief."
>
> At every stage in the investigation and termination, Defendants honestly believed that Plaintiff should be terminated.  Greene and Pintsov conducted the investigation, found that the witnesses they interviewed were credible, that the incidents in Cancun actually occurred, and recommended termination.  [*Sanford*, 2010 U.S. Dist. LEXIS 129464 at *57 (citation omitted).]

Similar deference should be afforded to ACIA's business judgments concerning its investigation

of incidents and the discharge decision.  *Blizzard*, __ F.3d __; 2012 U.S. App. LEXIS 21846,

*16-18 (Exh P) (affirming summary judgment for the employer that investigated complaints

against the plaintiff and made business judgments based on the evidence before it).

 To the extent that Plaintiff claims his managers should have engaged in additional

investigation, ACIA was not obligated to perform a perfect investigation of each incident.  It was

not required to leave "no stone unturned."  *Scott v. FirstMerit Corp.*, 167 Fed. Appx. 480, 484

(6th Cir. 2006), quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (no pretext

where the employer made a reasonably informed and considered decision).  See, *Chen*, 580 F.3d

at 401 (an employer that honestly relies on particularized facts in making an employment

decision is entitled to summary judgment even if its conclusion is later shown to be "mistaken,

foolish, trivial, or baseless"), and *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494-496 (6th Cir.

2001) (although the plaintiff disputed underlying facts concerning his misconduct, he failed to

show that the defendant's discharge decision was not based on a reasonable belief that he

violated work rules). The record demonstrates that ACIA engaged in reasonable investigation of the complaints. This was certainly true where the complainants lacked any motivation to contrive stories about Plaintiff. And ACIA was entitled to make credibility assessments to the extent that there were varying versions of the incidents. *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003) (the fact that subjectivity is involved in an employer's assessment does not render an employment decision infirm).

Plaintiff's mere opinion that some of the complained-of incidents were minor or "petty" is also insufficient to raise a triable issue as to pretext. Conclusory assertions supported only by Plaintiff's opinions cannot withstand summary judgment. *Lattimore v. Wild Flavors, Inc.*, 2012 U.S. Dist. LEXIS 7826, *37 (E.D. Ky. 2012), citing *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008). ACIA was entitled to make the business judgment as to what was acceptable conduct for its managers. See, *Reynolds v. Humko Products*, 756 F.2d 469, 472 (6th Cir. 1985) (employers may determine that certain misconduct is grounds for termination and apply the standard equally). It cannot be disputed that all ACIA managers are required to conduct themselves in a professional and respectful manner. (Porter Decl at ¶ 6, Exh N.) ACIA reasonably expects its managers to motivate their staffs without belittling them or using inappropriate language or a heavy-handed dictatorial approach. (Welsh Decl at ¶ 18, Exh E.) And ACIA has discharged non-African-American managers for poor managerial skills. (*Id.* at ¶ 22.) Frankly, all of the documentation between Plaintiff and his managers demonstrates that, despite their frustrations with Plaintiff's ongoing pattern of misconduct, they were always professional, restrained, and constructive in their interactions with him.

Plaintiff cannot defeat summary judgment with the argument that his managers should have engaged in further investigation or granted him the benefit of the doubt. The decision

makers were receiving similarly themed complaints from various employees, even after Plaintiff was coached and counseled.  ACIA had every right to conclude that discharge was appropriate. An employer's business judgment as to the appropriate response to a rule violation is not subject to judicial second-guessing.  *Rutherford v. Britthaven Inc.*, 452 Fed. Appx. 667, 673 (6th Cir. 2011).  As is often stated, the judiciary does not sit as a "super-personnel department" second-guessing employers' business judgments.  *Hendricks v. Western Reserve Care System and Forum Health*, 355 F.3d 444, 462 (6th Cir. 2004); *Smith v. Leggett Wire*, 220 F.3d 752, 763 (6th Cir. 2000).

**C.    Plaintiff's Race Discrimination Claim Concerning His 2009 Bonus Fails As A Matter Of Law.**

Plaintiff also lacks any evidence to support his claim that ACIA denied him a bonus based on his race.  Plaintiff alleges that Mr. Welsh denied him sales credits that caused him to fall short of his 2009 year-end sales goal and to miss out on his production bonus.  The undisputed facts establish quite the opposite – Mr. Welsh took considerable steps to ensure that Plaintiff's questions about the bonus were answered and directed that Plaintiff be given every benefit of the doubt as to sales credits in question.  (Welsh emails, Exhs K and L.)

Plaintiff alleges that he inquired about his 2009 year-end numbers and was provided a total that showed he met his goal and was eligible for a bonus.  But sales numbers are subject to change based on final adjustments that are commonly made to policies during underwriting processes.  (Welsh dep at 26-27, Exh F; see also Pl dep at 419 – Plaintiff acknowledged that sales numbers are subject to update, he believed on a monthly or quarterly basis.)  Plaintiff's final reconciled sales numbers – which were not available until early 2010 due to these regular-course adjustments – left him short of his 2009 production goal.  Plaintiff discussed this with Mr. Welsh, as well as his belief that he was entitled to a bonus.  Plaintiff first raised this after

17

issuance of the reconciled sales numbers in early 2010. Mr. Welsh investigated the issue with the assistance of company sales analysts, who he directed to carefully re-calculate Plaintiff's sales and to examine specific credits that Plaintiff inquired about. That re-calculation again showed that Plaintiff was short of his goal. (Welsh dep at 25-26, Exh F.)

Plaintiff again questioned his bonus eligibility during the 2010 mid-year PIP process. Mr. Welsh investigated, directing the sales analysts to revisit Plaintiff's sales and to "look at [the issues] with a fine tooth comb." (Welsh dep at 27.) He directed the analysts to pull all AAA Life sales records, review all appeals by agents as to particular sales, and review all of Plaintiff's questions about credits. (*Id.*) Mr. Welsh further directed the analysts to give Plaintiff the benefit of the doubt in connection with credits that Plaintiff was arguing should be included but which the company could not confirm through records. (*Id.*; Welsh emails, Exh K.) This additional review and re-calculation again revealed that Plaintiff fell short of his 2009 sales goal. Thus, he was ineligible for a bonus. (Welsh email, Exh L.) Mr. Welsh relied on the analyst's final calculations. He made no changes to the numbers reported back to him by the analyst investigator. (Welsh dep at 29-30, Exh F.)

These are the undisputed facts surrounding the bonus. Plaintiff's mere speculation that his race was somehow involved or that others were provided a credit that he was not is insufficient to defeat summary judgment. A plaintiff cannot rely on speculation or conjecture to establish a genuine issue of material fact for trial. *Gecewicz v. Henry Ford Macomb Hospital Corp.*, 683 F.3d 316, 323 (6th Cir. 2012); *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 724 (6th Cir. 2004). The only other life managers in 2009 (Frank Desy, Plaintiff's only counterpart in Michigan at the time, and Mike Fletcher, both Caucasian) also fell short of their production goals in 2009 and did not receive bonuses. (Emails regarding incentive payouts, Exh J.)

**D.      Plaintiff's Litany Of Other Complaints Do Not Constitute Adverse Employment Actions.**

Plaintiff complains of various other alleged actions such as Gary Dick refusing to shake his hand during a meeting, coworkers instigating ill will toward him, and managers denying him help from administrative assistants.  These would not be adverse employment actions so as to be actionable.

An adverse employment action is a "materially adverse change in the terms or conditions of … employment because of [the] employer's conduct." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  A materially adverse change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*, at 886.  A change in working conditions that causes no "materially significant disadvantage" is insufficient.  *Id.*, quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).  Thus, de minimis employment actions are regularly held to be insufficient.  *Mitchell* v. *Vanderbilt University*, 389 F.3d 177, 182 (6th Cir. 2004).

Moreover, emails confirm that Messrs. Welsh and John advised Plaintiff that he could use various administrative assistants (including Mr. John's personal assistant) after Ms. Earhart quit following her conflict with Plaintiff.  Plaintiff always had equal opportunity to have assistants help him with his work.  (Emails, Exh R; see also John dep at 47-52, Exh C.)  Finally, Mr. Welsh indisputably investigated the handshake incident, concluding in a memo to file that he could not confirm any wrongdoing.  (Exh M.)  These claimed incidents simply do not rise to the level of actionable conduct supportive of a discrimination claim.

## IV. CONCLUSION

Plaintiff cannot demonstrate a genuine issue of material fact that would support his claims of intentional race discrimination.  Thus, Defendant requests that the Court grant its

19

Motion for Summary Judgment, in its entirety, and dismiss Plaintiff's claims as a matter of law.

Respectfully submitted,

KIENBAUM OPPERWALL
  HARDY & PELTON, P.L.C.

BY: */s/Jay C. Boger*
        Elizabeth P. Hardy (P37426)
        Jay C. Boger (P58805)
Attorneys for Defendant
280 North Old Woodward Ave.
Suite 400
Birmingham, Michigan  48009
(248) 645-0000
ehardy@kohp.com
jboger@kohp.com

Dated:  November 5, 2012

20

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALLORY BEARD,

      Plaintiff,

v.

THE AUTO CLUB INSURANCE
ASSOCIATION,

      Defendant.

Case No:  12-10726

Hon. Nancy G. Edmunds

_____/

| BURGESS & SHARP, PLLC | KIENBAUM OPPERWALL HARDY |
|---|---|
| Rex A. Burgess (P42779) |   & PELTON, P.L.C. |
| Heidi T. Sharp (P69641) | Elizabeth Hardy (37426) |
| Heidi J. Junttila (P72610) | Jay C. Boger (P58805) |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 43260 Garfield, Suite 280 | 280 N. Old Woodward Ave., Suite 400 |
| Clinton Township, MI 48038 | Birmingham, MI  48009 |
| (586) 226-2627 | (248) 645-0000 |
| rex@burgess-sharp.com | ehardy@kohp.com |
| | jboger@kohp.com |

_____/

## CERTIFICATE OF SERVICE

    I hereby certify that on November 5, 2012 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Rex A. Burgess at rex@burgess-sharp.com, and I hereby certify that I have mailed by United States Postal Service the foregoing document to the following non-ECF participants:

/s/Jay C. Boger
280 North Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
Email:  jboger@kohp.com
(P58805)

172946