UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALLORY BEARD,

    Plaintiff,

v.

THE AUTO CLUB INSURANCE
ASSOCIATION,

    Defendant.
_____/

Case No. 12-10726

Honorable Nancy G. Edmunds

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]**

    This employment dispute arises out of Defendant's termination of Plaintiff. Plaintiff alleges that Defendant Auto Club Insurance Association ("ACIA") discriminated against him on the basis of race and retaliated against him after he reported claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*[1]

---

[1] Although Plaintiff's complaint alleges only a claim of racial discrimination under Title VII and Elliott-Larsen, Plaintiff's response also asserts a claim of retaliation. Contrary to Defendant's arguments here, Plaintiff's deposition testimony does not foreclose this claim. (Pl.'s Resp., Ex. 18, Pl.'s 8/08/12 Dep. at 31-32.) When asked if race discrimination was his only claim in this lawsuit, Plaintiff responded "That's a start." (*Id.* at 32.) When asked to explain what he meant by that, Plaintiff responded, "Well, I'm not going to limit it to that if there's other factors that's brought out in the findings." (*Id.*) Plaintiff made it clear that he was reserving the right to amend his complaint.

    Q:    You mean you're reserving the right to amend your Complaint at a later point if something else comes to light?

    A:    Absolutely.

(*Id.*)

This matter is now before the Court on Defendant's motion for summary judgment. Because Plaintiff has come forward with evidence showing that genuine issues of material fact exist for trial, Defendant's motion for summary judgment is DENIED.

**I.  Facts**

On January 26, 2011, Plaintiff was terminated from his position as a Life Manager for Defendant ACIA. (Def.'s Mot., Ex. E, Welsh Decl., ¶ 3.) Plaintiff was promoted from life agent to that position in April 2008 by his then-supervisor, Craig Huffman. Huffman made the decision based upon his in-depth interview with Plaintiff and based upon the recommendation of Plaintiff's then-manager, Frank Desy, who told Huffman that Plaintiff "did well in his sales duties," was "a good producer," was "very cooperative," and "had the respect of the other [life] agents." (Pl.'s Resp., Ex. 22, Huffman 8/30/12 Dep. at 9-10.) At the time Plaintiff was terminated, there were three Life Managers. Plaintiff was the only African-American Life Manager. (*Id.* at 11.)

As a Life Manager, Plaintiff oversaw approximately twenty life specialists ("life agents") who sold life insurance on behalf of ACIA. Plaintiff's duties included some interviewing, hiring, and training of life agents, installing agents at branch offices or private insurance agencies, following up with agents, assisting them in their selling efforts, and motivating agents to sell. (Def.'s Mot, Ex. C, John 8/23/12 Dep. at 23-26; Ex. D, Dick 8/24/12 Dep. at 23-24, 27-28.) Life Managers work with two different levels of people on a day-to-day basis: (1) life agents who report directly to them; and (2) AAA branch managers (who are primarily dealing with property and casualty insurance) and general agents (who are employees of AAA but run their own agency at their own location) who sometimes resist the Life Managers' efforts to get them to implement the Life Managers'

training/monitoring/sales programs for life agents. (Huffman Dep. at 12; Pl.'s Resp., Ex. 21, Dick 8/24/12 Dep. at 22, 27.)

Life Managers have annual sales goals; and, if they met (or, in the past, came close to) their goals, they were eligible for a bonus. (Huffman Dep. at 28-29.) A Life Manager's ability to reach his goal depends on the production of the agents underneath him. (Welsh 8/31/12 Dep. at 19.) It is set based on the supervisor's consideration of the established "corporate goal" set by his superiors and his forecast for the average numbers of agents assigned to the Life Manager over the course of a year, i.e., if a Life Manager had a total of 15 agents and anticipated hires, then the forecasted average life agent's production would be multiplied by 15 and that would be the Life Manager's goal. There was some flexibility in arriving at a goal, i.e., "[i]f one manager had a higher number of brand-new agents than another, et cetera, then there could be adjustments." (Huffman Dep. at 29-30; Welsh Dep. at 20-21.) If agents changed mid-year from one Life Manager to another, it was standard operating procedure to change their goals. (Huffman Dep. at 31.)

From April 2008 to August 2009, Plaintiff reported to Craig Huffman. From September 2009 through May 31, 2010, Plaintiff reported to Tony Welsh, the Vice President of Field Operations. From June 2010 until his termination in January 2011, Plaintiff reported to Michael John, Assistant Vice President of Life Insurance. (Def.'s Mot., Ex. E, Welsh 11/2/12 Decl., ¶ 4.)

In 2009, Plaintiff and Frank Desy were the only Life Managers, covering two regions. In mid-2010, there was a restructuring of the life sales operation. Sam Nestico, who was a recent re-hire and worked directly under Gary Dick (the director and person in charge of life sales support for the Auto Club Group), was added as a Life Manager, and territories

were re-assigned and life agents were divided up. (Welsh 8/31/12 Dep. at 21-25; Dick 8/24/12 Dep. at 5, 26.)

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III. Analysis

### A. Plaintiff's Mixed Motive Claim

The familiar *McDonnell Douglas/Burdine* burden-shifting framework "does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (emphasis in original). As the Sixth Circuit recently observed, "[t]o defeat summary judgment on a discrimination claim under a mixed-motive analysis, the plaintiff must produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action." *Griffin v. Finkbeiner*, 689 F.3d 584, 594-95 (6th Cir. 2012) (internal quotation marks and citation omitted). "The evidence of discrimination can be

4

direct or circumstantial." *Id.* "Moreover, the burden of producing such evidence is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* (internal quotation marks and citations omitted).

The "elimination of possible legitimate reasons for the defendant's action is not needed when assessing whether trial is warranted in the mixed-motive context." *White*, 533 F.3d at 401. The plaintiff need only "demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *Id.* "The ultimate question for the court in making a summary judgment determination is . . . whether there are any genuine issues of material fact concerning defendant's motivations for its adverse employment decision. . . ." *Id.* at 402. As the *White* court observed, because "inquiries regarding what actually motivated an employer's decision are very fact intensive, such issues will generally be difficult to determine at the summary judgment stage and thus will typically require sending the case to the jury." *Id.* (internal quotation marks and citations omitted).

Construing the evidence here in the light most favorable to Plaintiff, this Court concludes that genuine issues of material fact concerning Defendant's motivations for its adverse employment decision exist for trial. It is not disputed that Plaintiff is a member of a protected class and that his termination constitutes an adverse employment action. Despite Defendant's claims to the contrary, Plaintiff presents circumstantial evidence supporting the second prong of his mixed motive discrimination claim, i.e., his claim that comparable Caucasian employees were treated more favorably, as well as evidence

showing that he was treated less favorably than Caucasian employees under comparable circumstances.

For example, Plaintiff presents evidence regarding Defendant's disparate treatment of him and fellow life manager Frank Desy once Tony Welsh became Plaintiff's supervisor. Plaintiff testified that, in 2009, when the sales goals were initially established, Plaintiff had more trained agents than Frank Desy. So, Plaintiff, Frank Desy, and his then-supervisor, Craig Huffman, agreed that several of Plaintiff's sales agents would be reassigned to Frank Desy to even out the number of trained agents assigned to them. It was also agreed that the 2009 sales goals would be re-determined and adjusted according to the change in personnel. When Plaintiff tried to get the sales goal readjusted, his new supervisor, Tony Welsh, refused to do so. Plaintiff alleges that this disparate treatment benefitted his Caucasian counterpart, Frank Desy, harmed Plaintiff's ability to reach his production goal and obtain a bonus for 2009, and is some evidence of Defendant's race-based discrimination. (Pl.'s Dep. at 139-154; Welsh Dep. at 21, 38-45 Pl.'s Resp., Ex. 1, Pl.'s 8/25/09 email; Ex. 2, Welsh 9/21/09 email; Ex. 5, Welsh 8/24/10 email (acknowledging that Plaintiff was 98.9% to goal).)

Defendant discharged Plaintiff based on co-worker complaints about Plaintiff's harsh interactions with them and his management style. (Def.'s Mot., P. Porter 11/2/12 Decl., ¶ 6.) Plaintiff presents circumstantial evidence showing that he was treated less favorably than Caucasian employees under comparable circumstances and that his claims of race discrimination and disparate treatment were not adequately investigated. For example, Plaintiff complained to superiors about an incident where Gary Dick refused to shake his

hand in the presence of a life agent trainee. In the March 11, 2011 letter denying Plaintiff's appeal of his termination, this incident received the following review:

> Beard mentioned an incident during which <u>he believed</u> Gary refused to shake his hand. Although there is some dispute over what occurred, the incident was addressed in detail by Tony Welsh in July 2010. Beard was provided with a memo on this matter. There is nothing additional to add.

(Def.'s Mot., P. Porter Decl., Tab 1, 3/11/11 letter (emphasis added).) In a July 27, 2010 Mid-Year PIP Review, Tony Welsh wrote the following:

> Mallory made two other statements that were of concern. He mentioned that the word on the street was "that they were out to get me" and he felt he was being discriminated against.
>
> Regarding the discrimination comment, I asked him how he was being discriminated against. Mallory responded that Gary Dick exaggerated situations and that 90% of what is being discussed (in this PIP) is because of Gary. I pointed out that while Gary was involved in some of these situations, the topics discussed came from a variety of different people, at different times, with different responsibilities with a common theme on communication issues. <u>Mallory pointed out an instance in Gary's office where he offered his hand for Gary to shake before introducing a new LS [life specialist]. According to Mallory, Gary brushed his hand aside and immediately shook the hand of the new LS.</u> I will investigate this situation with Gary Dick.

(Pl.'s Resp., Ex. 8 at 7) (emphasis added). On July 29, 2010, Welsh sent Plaintiff an email with an attached file memo, dated July 28, 2010, about Welsh's investigation of Plaintiff's discrimination complaint:

> During my mid-year review with Malloy Beard on July 27, 2010, Mallory mentioned an instance in Gary Dick's office where sometime earlier this year he offered his hand for Gary to shake before introducing new LS. According to Mallory, Gary brushed his hand aside and immediately shook the hand of the new LS.
>
> Mallory took offense to this situation and indicated he thought it to be discriminatory.

7

<u>I met with Gary Dick and on this date and described the incident. Gary stated that he did not recall any such incident and that he has always dealt with Mallory as one professional to another.</u>

Gary went on to say that he will continue to do so with his dealings with Mallory.

A copy of this memo to file has been provided to Mallory Beard and Gary Dick.

(Def.'s Ex. M) (emphasis added). Thus, the investigation of Plaintiff's discrimination complaint began with Welsh asking Gary Dick if it happened and closed with Dick's response that he did not recall the incident. (Pl.'s Resp., Ex. 25, Welsh 8/31/12 Dep. at 72.) There is no evidence that Welsh attempted to identify or contact the new life specialist involved to investigate further.

Co-worker complaints about Plaintiff that led to his termination, however, did not end with Plaintiff's simple denial that the incident happened as reported. For example, in his Declaration, Tony Welsh describes a complaint from then-Agent Development Center Trainer Sam Nestico (who worked directly under Gary Dick) that Plaintiff had contacted sales agent trainees and told them he would be placing them in field sales positions. Welsh acknowledged that Plaintiff denied that he was contacting agents prematurely, but he nonetheless conducted further investigation. (Def.'s Mot., Ex. E, Welsh 11/2/12 Decl., ¶ 8.)

Plaintiff also presents evidence of numerous other incidents of similar disparate treatment for comparable conduct, i.e., a complaint brought to Welsh's attention by Plaintiff's then-supervisor Michael John and/or by Gary Dick concerning a January 2011 incident between life agent Floyd Wells and Plaintiff. (*Id.* at ¶ 16.) Welsh states that Floyd Wells, who was in training, told him that Plaintiff cornered him and accused him of being disrespectful, lectured him at length, and pressured him to commit to working for him, and

that Plaintiff bad-mouthed other sales managers. Although Plaintiff had a different version of events, i.e., that Floyd Wells had started a loud, confrontation in front of other employees and Plaintiff moved it to a more private area, Welsh did not question anyone else at the location and concluded that Plaintiff had engaged in an "aggressive and unprofessional interaction." (*Id.*) He reached this conclusion despite Plaintiff's version of events.

On January 14, 2011, Plaintiff's then-supervisor, Michael John, asked him about his contacts with Floyd Wells. Plaintiff explained that, in his first phone contact after Wells was assigned to Plaintiff's district, Wells told Plaintiff that he would not work for him, that he would make sure he did not work for Plaintiff, and that he had already set up a meeting with Gary Dick. This happened again. Wells told Plaintiff that he was not going to work for him and that Plaintiff would be contacted by upper management about it. Plaintiff then told Wells that, until he heard otherwise, Wells should plan on attending scheduled on-line meetings. Wells did not do so. So, on January 6, 2011, when Plaintiff was at Wells' location, he approached him and asked if he had a problem with the links to the meetings he should be attending. Plaintiff told his supervisor, Michael John, that Wells was hostile, telling him that he would not work for him and already had a meeting set up with Gary Dick. Plaintiff tried to move the conversation to a more private area and did so. When Wells explained that he did not want to work with him because other agents said he was a micro-manager, Plaintiff explained his management style. Wells apologized, promised he would not listen to others, and agreed to work with him. ((Pl.'s Resp., Ex. 16, 1/14/11 email.) Plaintiff also denied that he said anything derogatory about Gary Dick in his January 6, 2011 conversation with Wells. He admitted that Gary Dick was discussed, mostly by Wells,

9

who said Gary Dick would make sure he was placed in Allen Park. He also denied that he disparaged Tony Porter or Robert Williams. (*Id.*)

On January 20, 2011, Welsh investigated Wells' complaint about Plaintiff. He recorded his conversation with Floyd Wells and identified that Gary Dick was also present. Defendant presents a transcript of that recorded conversation as an exhibit to its motion. (Def.'s Mot., Ex. 0, 1/20/11 Tr.) The gist of the conversation was that Plaintiff was trying to convince Wells to be on his sales team because it was the best, but Wells only had a few years left to work and wanted to be on the Allen Park team because it was close to his home. Plaintiff was upset because Wells didn't want to be on his team. (*Id.* at 2.) When Welsh asked Wells why he didn't want to be on Plaintiff's team, Wells turned the conversation to his complaints about his then-trainer Matt Tkach; and on further prompting by Welsh, admitted that others, i.e., life specialist Ken Gill, had told him that Plaintiff was like a drill sergeant and would push him to produce sales. Floyd Wells told Welsh that he didn't have enough energy to do as much work as it seemed Plaintiff wanted out of him. (*Id.* at 2-5.) So, from this evidence it is reasonable to infer that Wells' primary concern with Plaintiff's management style, was that he would push him to sell AAA's life insurance products work harder than he assumed he would assigned to a different Life Manager.

Welsh then asked Wells to discuss what Plaintiff said about other co-workers. Wells told Welsh that, in the end, he agreed to work with Plaintiff. (*Id.* at 5-7.) When Welsh asked Wells if he had any other complaints, he began complaining again about his then-trainer Matt. (*Id.*)

Welsh was asked about his investigation of the Floyd Wells incident at his deposition. (Pl.'s Resp., Ex. 25, Welsh 8/31/12 Dep. at 100-119.) He admitted that, although Floyd

10

Wells said other people were present for the January 6, 2011 incident, none were interviewed; even though Welsh insisted that "[i]t was the confrontation in front of others that was an issue." (Welsh Dep at 111-112, 114, 118.). He admitted that, although Floyd Wells told him that Ken Gill, a life specialist in Livonia, had made derogatory remarks about Plaintiff, he was not aware if Ken Gill was reprimanded for those remarks about a Life Manager that he admits would be inappropriate. (Welsh Dep. at 106.) Although Welsh insists that Plaintiff was being reprimanded because he was a Life Manager, a leader, who should not be making comments about others with a subordinate, he admits that he did not ask Wells who else made disparaging remarks to him about Plaintiff, i.e., were they in leadership positions. (Welsh Dep. at 107, 115.) Although their versions of the January 6th incident varied, Welsh chose to take Wells' version at face value. (Welsh at 112-113, 116-119.) Plaintiff presents ample other evidence where his version of a co-worker incident was rejected in favor of that of a non-minority co-worker, i.e., complaint by Jon French, life agent in Bay City, who complained to Michael John either that Plaintiff had not provided enough training or that French had "lost faith" in Plaintiff compared with Plaintiff's explanation to Michael John that, after Jon French had missed several training sessions and Plaintiff attempted to attend a meeting that French had with a client, Jon French told Plaintiff that they "didn't like black people up there and he didn't want [Plaintiff] to go on sales calls with him." (Welsh Dep. at 76-77, 82-84; Pl.'s Dep. 257-262, 404-410.)

Having determined that Plaintiff has presented sufficient evidence to show that genuine issues of material fact exist on his Title VII mixed-motive claim of race discrimination, the Court now turns to his single-motive claim.[2]

### B. Single-Motive Claim of Race Discrimination[3]

A plaintiff's single-motive claim of race discrimination under either Title VII or Michigan's ELCRA is analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Griffin*, 689 F.3d at 592 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

> Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated nonprotected employees. Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.

*White*, 533 F.3d at 391-92 (internal citations and parenthetical information omitted).

---

[2]As the Sixth Circuit recently observed, although "a plaintiff in a Title VII action may make out a prima facie claim of discrimination in a mixed-motive case using either direct or circumstantial evidence, Michigan courts continue to require that mixed-motive cases under [the Elliott-Larsen Civil Rights Act] be established by direct evidence." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012). Here, Plaintiff doesn't argue that there is direct evidence supporting his ELCRA claims of race discrimination. Because Plaintiff relies on circumstantial evidence to establish his ELCRA discrimination claim, he "must satisfy the *McDonnell Douglas* burden-shifting framework based on a single-motive theory." *Id.*

[3]Claims of racial discrimination and retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act receive the same analysis as those brought under Title VII. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652-53 (6th Cir. 2012).

It is not disputed that Plaintiff is a member of a protected class or that he suffered an adverse employment decision. Moreover, despite Defendant's claim to the contrary, Plaintiff presents sufficient evidence to create a genuine issue of material fact that he was qualified for his job. Defendant's argument that he was not qualified relies entirely on its asserted legitimate, non-discriminatory reason for Plaintiff's termination -- Plaintiff's "troubling interactions with coworkers" and "poor management and interaction skills." (Def.'s Mot. at 13; Def.'s Reply at 2.) Furthermore, despite Defendant's claim to the contrary, Plaintiff also presents sufficient evidence to create a genuine issue of material fact that he was treated less favorably than similarly situated nonprotected employees, i.e., evidence discussed above and other evidence of disparate treatment cited in Plaintiff's Response.

Finally, despite Defendant's claims to the contrary, Plaintiff also presents sufficient evidence to create a genuine issue of material fact showing that Defendant's proffered reason for his termination was not its true reason, but merely a pretext for racial discrimination. Plaintiff seeks to establish pretext "by showing that the employer's proffered explanation is unworthy of credence." *White*, 533 F.3d at 392 (internal quotation marks and citation omitted). "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. [Citation omitted]. However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Id.* at 393 (quoting *Wexler v. White's Fine Furniture, Inc.*,

13

317 F.3d 564, 578 (6th Cir. 2003) (en banc)). Here, as in *White*, Plaintiff has "produced enough evidence for a reasonable jury to infer that [Defendant]'s proffered explanation for its [termination] decision may be merely a pretext for unlawful discrimination." *Id.* at 394. Viewing the evidence in the light most favorable to Plaintiff, this Court finds that "a jury could reasonably disbelieve" Defendant's proffered explanation for Plaintiff's termination. *Id.* Accordingly, Defendant's motion for summary judgment on Plaintiff's single-motive race discrimination claims brought under Title VII and Michigan's ELCRA is denied.

The Court now considers Plaintiff's retaliation claim.

### C. Retaliation Claim

Based on the evidence produced in discovery, Plaintiff now asserts a claim that Defendant retaliated against him in response to his complaints of racial discrimination in violation of Title VII and Michigan's ELCRA. Plaintiff presents circumstantial evidence to support his retaliation claims; and so, they are analyzed under the same *McDonnell Douglas* burden-shifting framework as discussed above. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). "In order to establish a prima facie case of retaliation, the plaintiff must show: (1) that the plaintiff engaged in protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.* "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id.* (internal quotation marks and citation omitted). Moreover, "[a]lthough no one consideration is dispositive, a causal link may be shown through knowledge combined with closeness in time." *Id.* (internal quotation marks and citation omitted).

Construing the evidence in the light most favorable to Plaintiff, this Court concludes that Plaintiff has presented sufficient evidence to show that his complaints of racial discrimination were known to Defendant and that, as a result, he was thereafter retaliated against by Tony Welsh, Michael John, and Gary Dick and ultimately terminated, i.e., evidence that shortly after he reported claims of racial discrimination, written reports of his "inappropriate treatment of co-workers" and "poor management skills" were generated with great frequency; and, as described above and in Plaintiff's Response, his alleged misconduct was treated more severely than comparable conduct of non-protected co-workers. Accordingly, Plaintiff's claims of retaliation likewise survive Defendant's summary judgment motion.

### IV.  Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is DENIED.


       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated:  February 26, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 26, 2013, by electronic and/or ordinary mail.

       s/Carol A. Hemeyer
       Case Manager

15